UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | |
|---|---|
| **PAUL MIGLIACCIO**<br><br>PLAINTIFF<br><br>v.<br><br>**ALLY BANK**<br><br>DEFENDANT | CIVIL ACTION NO: 1:24-CV-00307-SDN |

***PLAINTIFF'S RESPONSE TO DEFENDANT ALLY BANK'S MOTION TO COMPEL ARBITRATION AND STRIKE CLASS CLAIMS, OR IN THE ALTERNATIVE, MOTION TO DISMISS PLAINTIFF'S COMPLAINT AND INCORPORATED MEMORANDUM OF LAW***

## INTRODUCTION

Lee Credit Express (LCE or the Dealer), one of the largest Dealerships in the State, charges Mainers, rich and poor, a $649 fee simply for generating the paperwork required to sell a car.[1] Just about every other car dealer in Maine does the same. This fee, often referred to as a document or processing fee, covers tasks that take only minutes and are a necessary part of every car sale. Most dealerships across Maine impose similar fees, with some charging more and some less, but most charging several hundred dollars. Customers receive no real benefit in return for this charge. With over 100,000 new and used cars sold annually in Maine, these excessive fees add up to tens of millions of dollars each year, unfairly burdening customers.[2]

---

[1] Statements in this introduction are made on information and belief and would, counsel believes, be shown in discovery.
[2] Maine has about .4% of the US population. According to Consumer Affairs, 52 million new and used vehicles were sold in the USA in 2022, .4% of 52 million is 208,000. At $400 per sale, this would total over $80M in junk fees.

1

Maine law is such that dealers can charge these fees, but *only* if the fees are included in the advertised price of the car. Few, if any, dealers in Maine follow this simple rule. Some customers—perhaps most—look online first to see prices and only commit the time to go visit a car dealer after seeing a good price on a car they're interested in buying. Higher advertised prices mean fewer customers through the doors. Dealerships, including Lee Credit Express, typically exclude document fees from the advertised price, catching buyers off-guard during the final stages of the sale. These fees often go unnoticed until it is too late to negotiate or walk away. Despite the widespread nature of this practice, there is limited enforcement, allowing dealerships to continue imposing these hidden fees with little accountability.

Most dealers must also arrange financing for their customers to sell a vehicle. The dealers take a credit application from the consumer, transmit and shop that application to a network of lenders, and get the loan pre-approved so that when the consumer signs the dealer's financing contract, the financing contract gets instantaneously assigned to the pre-approved lender. In this situation, that lender is Ally. In Mr. Migliaccio's case, and nearly all others, the assignee is already printed out on the RISC when it is signed; the Retail Installment Sale Contract (RISC) is assigned to the lender the moment it is signed.[3] That financing contract, which is a standard form, used throughout the state, carries with it liability for the dealer's violations of state law under the FTC Holder Rule and state law, and contains no mention of arbitration. It also contains a clear merger clause saying it is the only agreement between the lender and the consumer. Thus, Mr. Miggliaccio brings this action against Ally Bank to seek class-wide relief for this obvious wrong which Ally profits from.

---

[3] An obvious question is why does the finance contract include the dealer at all? The dealer is listed as the creditor so that the lender is only treated as an assignee of the finance contract and not the "creditor" for purposes of the Truth in Lending Act. Under the Truth in Lending Act an assignee is treated differently than the creditor and can only be held liable for disclosure violations that appear on the face of the disclosure. See e.g.15 USCA §1641(a).

Ally moves to compel arbitration. Ally does not rely on the RISC for its argument, nor could it because the RISC does not have an arbitration provision. Instead, Ally asks the court to treat it as an assignee of a Retail Purchase Agreement ("RPA"). To do so would require the Court to ignore that assignment of the RPA would violate federal law that requires any assignment of a consumer credit contract to include notice of the Holder Rule – the RPA does not have notice of the Holder Rule. There are other reasons Ally's motion to compel fails, too, including that Ally fails to meet its burden on a motion to compel. Ally's motion to compel should also be denied.

Last, Ally seeks to strike class allegations at the pleading stage. This case involves relatively modest, although valueless, fees collected by the Dealer. Most would not file a claim for the wrongful fee, and few lawyers would take such cases. That fee's impact is also greater than its amount alone since it is also part of the balance financed by consumers. They must also pay interest on that amount. Ally's motion comes before any discovery has been conducted. The motion should be denied and Plaintiff given an opportunity to conduct discovery.

**PROCEDURAL AND FACTUAL BACKGROUND**

Plaintiff filed this action in State court and it was timely removed. The Defendant filed its responsive pleading to the complaint on September 16, 2024 (Doc. 9): a motion to compel arbitration and a motion to dismiss the complaint for failure to state a claim upon which relief can be granted and a motion to strike class allegations. Attached to the pleading were two documents purporting to be the Retail Installment Sales Contract (RISC) between the Plaintiff and Ally, and a Retail Sales Contract (RPA) between LCE and the Plaintiff. Contracts integral to a complaint may be considered on a motion to dismiss, however, a motion to compel arbitration is decided on the summary judgment standard.

3

**LAW AND ARGUMENT**

The Complaint lays out a plausible claim for a violation of the Maine Unfair Trade Practices Act (UTPA). An assignee of a consumer credit contract is liable for violations of the assigner under the terms of the assigned contract, federal rules, and state law.

The Motion to Compel arbitration should be denied. It is for the Court to decide if there is an agreement to arbitrate when a motion to compel is filed. The standard on such a motion is the summary judgment standard—the movant bears the burden and must present evidence that there is a valid agreement to arbitrate between the parties. Ally has failed to do so. There is no admissible evidence and no record to grant summary judgment in favor of Ally. It also seems very unlikely, assuming the documents it has presented were admissible, that Ally could show that it has any agreement with the Plaintiff to arbitrate. For that to be the case, there would need to be a valid assignment of the RPA from LCE to Ally. But, LCE only assigned the RISC to Ally and the RISC 1) does not have an arbitration provision and 2) has an unambiguous merger clause saying it is the only agreement between Ally and Mr. Migliaccio.

For the reasons laid out below, the Defendant's motion should be denied.

I. THE COMPLAINT ALLEGES A VIOLATION OF THE UNFAIR TRADE PRACTICES ACT FOR WHICH ALLY IS LIABLE UNDER THE "HOLDER RULE"

In evaluating a motion to dismiss under Rule 12(b)(6), the court accepts all well-pleaded facts in the complaint as true and draws all reasonable inferences in favor of the plaintiff. *Ocasio-Hernández v. Fortuño-Burset*, 640 F.3d 1, 11-12 (1st Cir. 2011). The complaint need only present sufficient factual matter to state a claim that is plausible on its face, allowing the court to reasonably infer that the defendant is liable for the alleged misconduct. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). While the plausibility standard does not demand detailed

factual allegations, it requires more than mere conclusory statements or a recitation of the legal elements of the claim. Plaintiff's claims against Defendant based on its status as assignee of a consumer contract satisfy the plausibility test. Accordingly, the motion to dismiss should be denied.

> A. **The Complaint Establishes a Plausible Claim for a Violation of the Unfair Trade Practice Act.**

The Maine Unfair Trade Practices Act ("UTPA") makes it unlawful for a business to engage in unfair or deceptive trade practices. 5 M.R.S.A. § 207. A consumer harmed by a business's unfair or deceptive trade practice may bring a claim against the business, may bring a class action, and is entitled to present her claims to a jury. 5 M.R.S.A. § 213(1).

Plaintiff's claim is based on being charged a $649 document fee on a purchase of a car that the dealer did not disclose when it *advertised* the car the Plaintiff bought. Complaint ¶ 21. The Attorney General of the State of Maine issued regulations making it unlawful, and a prima facia violation of the UTPA, for a car dealer to charge document fees in connection with the sale of a vehicle *unless* the car dealer includes the document fees in the advertised price of the vehicle. See Complaint ¶¶ 32-33; See *26-239 C.M.R. Ch. 104:* Summary ("this chapter describes advertising practices by new and used motor vehicle dealers that are unfair and deceptive in violation of the Maine Unfair Trade Practices Act"). Plaintiff's complaint adequately alleges that there was a violation of the UTPA when he was charged an unadvertised document fee. The $649 document fee was valueless to him and he is thus harmed by paying a bogus fee not permitted by law. Complaint at ¶ 35. The Plaintiff also alleges that he was not the only one who was charged the document fee, because it was the dealer's practice, and a common practice statewide, to charge these junk document fees without advertising them. Defendant is liable for the dealer's actions as the assignee of consumer contracts. Complaint ¶ 36.

5

**B. The Defendant is liable for the Dealer's Violations of the Unfair Trade Practices Act under the Holder Rule, Under Contract, and Under State Law.**

There are three reasons the Defendant is liable for the dealer's wrongful conduct: (1) the contract it was assigned says so; (2) federal law makes it liable; and (3) Maine law by statute and common law makes it liable.

First, the contract, the RISC, between the Plaintiff and Ally specifically says Ally is liable for claims that could be brought against the Dealer. It says:

> NOTICE: ANY HOLDER OF THIS CONSUMER CREDIT CONTRACT IS SUBJECT TO ALL CLAIMS AND DEFENSES WHICH THE DEBTOR COULD ASSERT AGAINST THE SELLER OF GOODS OR SERVICES OBTAINED PURSUANT HERETO OR WITH THE PROCEEDS HEREOF. RECOVERY HEREUNDER BY THE DEBTOR SHALL NOT EXCEED AMOUNTS PAID BY THE DEBTOR HEREUNDER.

The Court may consider the RISC in connection with Ally's 12(b)(6) motion. See *Beddall v. State St. Bank & Trust Co.*, 137 F.3d 12, 17 (1st Cir. 1998) ("When . . . a complaint's factual allegations are expressly linked to-and admittedly dependent upon-a document (the authenticity of which is not challenged), that document effectively merges into the pleadings and the trial court can review it in deciding a motion to dismiss under Rule 12(b)(6)").

Second, the contract provision also mirrors federal law that makes Ally liable under the "Holder Rule" codified at 16 C.F.R. 433. "[T]he Holder Rule allows consumers to assert sale-related claims and defenses against any holder of a consumer contract." *LaBarre v. Credit Acceptance Corp.*, 175 F.3d 640, 644 (8th Cir. 1999); *Marks v. MRD Corp.*, C.A. No. 15-10157-MLW, at *16-17 (D. Mass. Sep. 12, 2016) (the "holder of a consumer credit contract is subject to all claims and defenses which the debtor could assert against the seller of goods or services obtained through the contract.")[4] (Citing 16 C.F.R. §433.2(a)).

---

[4] Ally does not contest that it is the holder of the contract or that Mr. Migliaccio is a consumer.

Third, "[i]t is **axiomatic** that an "assignee 'stands in the shoes' of the assignor." *R.I. Hosp. Trust Nat'l Bank v. Ohio Cas. Ins. Co.,* 789 F.2d 74, 81 (1st Cir.1986) (quoting 10 W. Jaeger, *Williston on Contracts* § 432, at 182 (3d ed.1967)). Fourth, Maine law, too, contains its own statutory provision for assignee liability in consumer transactions which says that "an assignee of the rights of the seller or lessor is subject to all claims and defenses of the buyer or lessee against the seller or lessor arising out of the sale" 9-A M.R.S.A. 3-403.

For these reasons, Ally can be held liable for the acts of its assignor.

Ally's arguments ignore the plain language of the contract, the Holder Rule, and Maine statute. Instead, it focuses on cases involving allegations of a fiduciary relationship between banks and consumers, even though there is no fiduciary relationship alleged, nor is this a commercial transaction. For example, Ally cites *Michelin Tires (Canada) Ltd. v. First Nat. Bank of Bos.,* 666 F.2d 673, 679 (1st Cir. 1981) but that case is very different because it rejects assignee liability in a commercial relationship and under § 9-318(1)(a) of the UCC.

Based on the foregoing, the Complaint alleges a claim for violations of the Maine Unfair Trade Practices that apply to Ally Bank as assignee of the RISC. The complaint makes it over the low bar to overcome a challenge under rule 12(b)(6).

II.  ALLY HAS FAILED TO SHOW THAT THERE IS ANY AGREEMENT TO ARBITRATE BETWEEN ITSELF AND THE PLAINTIFF.

**A. The Court Determines the Gateway Arbitrability Issue of Whether There is A Contract to Arbitrate Between Plaintiff and Ally.**

"The FAA reflects the fundamental principle that arbitration is a matter of contract." *Rent-A-Ctr., W., Inc. v. Jackson,* 561 U.S. 63, 67 (2010). The question of whether a valid contract exists

7

between the parties is <u>always</u> one for the court. *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 586 U.S. 63, 69, 139 S. Ct. 524, 530, 202 L. Ed. 2d 480 (2019) ("[t]o be sure, before referring a dispute to an arbitrator, the <u>court determines whether a valid arbitration agreement exists</u>")(emphasis added).. And, the Supreme Court has made clear that agreements to arbitrate are not treated any differently than any other contract. *Morgan v. Sundance, Inc.,* 142 S. Ct. 1708 (2022) ("a court must hold a party to its arbitration contract just as the court would to any other kind. But a court may not devise novel rules to favor arbitration over litigation").

Here, it seems likely that the Dealer and the Plaintiff formed an agreement to arbitrate under the RPA. But there is nothing to show that the Dealer assigned its rights to compel arbitration under the RPA to Ally. So the question for this Court, which will likely be answered in the negative, is "is there a valid agreement to arbitrate between the parties now in this dispute?"

### B. The Party Seeking to Compel Arbitration Under the FAA Bears the Burden of Establishing that a Valid Agreement to Arbitrate Between the Parties Exists.

The party seeking to compel arbitration bears the burden of establishing that there is a valid agreement to arbitrate between the parties. *Soto-Fonalledas v. Ritz-Carlton San Juan Hotel Spa & Casino*, 640 F.3d 471, 474 (1st Cir. 2011) (the party seeking to compel arbitration must show "that a valid agreement to arbitrate exists, that the movant is entitled to invoke the arbitration clause [and that ] that the other party is bound by that clause."); *Nat'l Fed'n of the Blind v. The Container Store, Inc., 904 F.3d 70, 80* (1st Cir. 2018) ("the party seeking to compel arbitration . . . bears the burden of demonstrating that a valid agreement to arbitrate exists").

In cases where the party seeking to compel arbitration claims that right by dint of an assignment of the right to compel arbitration, that party also bears the burden of showing that there has been a valid assignment. Under Maine law, to show that a contract has been assigned, there needs to be proof that the alleged assignor intended to transfer the right or rights being assigned to

8

the assignee. *Sturtevant v. Town of Winthrop*, 732 A.2d 264, 267 (Me. 1999) ("For an assignment to be enforceable there must be an act or manifestation by the assignor indicating the intent to transfer the right to the assignee."(Citing Doughty v. Sullivan, 661 A.2d 1112, 1124 (Me. 1995) and Restatement (Second) of Contracts § 324 (1981)"). The obvious way to show the intent is to provide a written assignment of any rights. Ally does not offer any writing to support its claim of an assignment. Ally Bank's Motion to Compel and Motion to Strike should be denied.

### C. Ally Does Not Meet Its Burden Under The Summary Judgment Standard That Applies to Motions to Compel Arbitration

The First Circuit, and nearly all other Circuits, say that "district courts should apply the summary judgment standard to evaluate motions to compel arbitration under the FAA." *Air-Con, Inc. v. Daikin Applied Latin Am., LLC*, 21 F.4th 168, 175 (1st Cir. 2021).

> Pursuant to the summary judgment standard, the court must construe the record in the light most favorable to the non-moving party and draw all reasonable inferences in its favor. *Taite v. Bridgewater State Univ., Bd. of Trs.*, 999 F.3d 86, 92 (1st Cir. 2021) ; *Tinder*, 305 F.3d at 735. If the non-moving party puts forward materials that create a genuine issue of fact about a dispute's arbitrability, the district court "shall proceed summarily" to trial to resolve that question. 9 U.S.C. § 4 ; see *Neb. Mach. Co., Inc.v. Cargotec Sols.*, LLC, 762 F.3d 737, 744 (8th Cir. 2014).

*Id.*

Ally does not claim that it entered a contract with the Plaintiff to arbitrate any disputes. Instead, Ally asks the court to enforce an arbitration provision that is found in the RPA between Plaintiff and the Dealer. But, Ally Bank is not a party to the RPA. Ally falls far short of its burden to prove that there is a contract to arbitrate between it and Plaintiff. Here, there is no evidence before the Court to support Ally's motion; the RPA is only between Plaintiff and LCE. The RISC is the only agreement between Ally and the Plaintiff and the RISC does not include an agreement to arbitrate or a class action waiver.

Ally makes no effort to introduce the RPA as evidence. Ally presents no assignment of rights. Ally does nothing more than attach a purported RPA to its motion without any affidavit or other support. On summary judgment, only admissible evidence will be considered. *See* Fed.R.Civ.P. 56(e); *Feliciano v. Rhode Island,* 160 F.3d 780, 787 (1st Cir. 1998) ("Fed.R.Civ.P. 56(e) requires the parties to submit admissible evidence in supporting and opposing motions for summary judgment."); *Hoffman v. Applicators Sales Service, Inc.*, 366 F. Supp. 2d 177, 183 (D. Me. 2005); *Ramirez v. DeCoster,* 194 F.R.D. 348, 359 (D. Me. 2000). The Court can deny the motion on this basis alone. See, e.g., *Lath v. BMS Cat & Amica Mut. Ins. Co.*, 2018 DNH 79, 3 (D.N.H. 2018) ("the appropriate remedy for such an omission is a denial of the motion").

**D. Even if the Contracts Attached to the Motion were Admissible, Ally Still Presents No Evidence that the Arbitration Agreement was Assigned to It.**

Even if the Court overlooked that the RPA, which contains the agreement to arbitrate, is not admissible evidence, Ally does not show that it has any rights to enforce the agreement to arbitrate contained within the RPA. Ally is not a party to the RPA, and there is nothing to suggest that LCE assigned the agreement to arbitrate contained within the RPA to Ally. A non-party has no right to enforce a contract. *Klaas v. IGT Glob. Sols. Corp.*, 21-cv-820-jdp, at *4 (W.D. Wis. Aug. 15, 2022) ("The general rule is that only a party to a contract may enforce it"); *Sogeti USA LLC v. Scariano*, 606 F. Supp. 2d 1080, 1087 (D. Ariz. 2009) ("Generally, only the parties . . . to a contract may enforce it"); *Roeslein & Assocs., Inc. v. Elgin*, No. 4:17 CV 1351 JMB, at *33 (E.D. Mo. Jan. 15, 2019) ("Only a party to a contract may enforce it").

**E. The RISC Is Limited to Its Express Terms By Inclusion Of A Merger Clause.**

The RISC, the only contract between the Plaintiff and Ally Bank, contains an unambiguous merger clause saying that "this contract contains the entire agreement between you and us relating to

10

this contract." An unambiguous merger clause means that a party cannot introduce, and the court should not consider, extrinsic evidence outside the four corners of the contract:

> The parol evidence rule operates to exclude from judicial consideration extrinsic evidence offered to alter, augment, or contradict the unambiguous language of an integrated written agreement. Application of the rule requires an initial finding that the parties intended the writing to integrate their understandings concerning the subject matter of the agreement. To determine whether integration was intended and whether the scope of integration was complete or partial, the court may consider extrinsic evidence. Such consideration, however, is only appropriate where the agreement is ambiguous on the issue of integration. <u>Where the language of the agreement is unambiguous with respect to the existence and scope of integration, no extrinsic evidence concerning integration may be presented by the parties or considered by the court.</u>

*Handy Boat v. Professional Services, Inc.*, 711 A.2d 1306, 1308-09 (Me. 1998) (internal citations omitted, emphasis added).

The merger clause makes sense when considering the sequence of the RPA and the RISC in the sale of a car. The RPA is written to establish the price that the consumer will pay the Dealer for the car. The consumer can pay cash based on the RPA and that is the final and only agreement between the dealer and the consumer. There is no third party involved.

If the car purchase is financed then the consumer and a finance company procured by the dealer, enter into a RISC. The RISC is, for all intents and purposes, an agreement between the bank and the consumer to pay the dealer for the car. Neither the dealer, nor any assignee of the dealer wants conflicts to arise between the RPA and the RISC, anymore than the dealer or its assignee wants a consumer to contend there were oral promises made by the dealer.

Moreover, the arbitration agreement contained in the RPA is specific to the relationship between the Dealer and its customer. The RPA states "We, Us, Our – Means the Dealership that is

11

identified on the front of this Agreement and its Authorized Representatives". See Exhibit 1. [5] The description of the arbitration agreement on the front of the RPA specifically identifies it as an agreement between "Purchaser(s) and Dealer". The arbitration provision on the back of the RPA repeatedly refers to the personal nature of the agreement being between "Buyer" and "Seller", stating at the outset that "***Buyer and Seller** agree that all claims, disputes or controversies of every kind and nature that may arise between **Buyer and Seller**" are to be arbitrated.* It also seems unlikely that it was ever contemplated that the dealer would assign the RPA to anyone else since it does not include any notice of the "Holder Rule" that is included in the RISC.

To find the dealer assigned the RPA without a disclosure of the Holder Rule would require the Court to conclude that the dealer violated federal law that requires a disclosure of the Holder Rule in any consumer credit contract. See 16 CFR 433.2. The RPA meets the FCC's broad definition of "consumer credit contract" which is "[a]ny instrument which evidences or embodies a debt arising from a . . . "financed sale." 16 C.F.R. 433.1. The RPA notes on the first page, at the bottom of the column showing the sales prices and certain add-ons, (including the $649.00 document fee) an "amount to be financed" by Mr. Migliaccio. The RPA, on the second page, Paragraph 9, indicates that the buyer has granted the Dealer a security interest, through the RPA, in the car and that the dealer is a secured creditor. See Exhibit 1.[6]

The language of the arbitration agreement refers to other agreements between the Plaintiff/Buyer and Dealer/Seller ("any products purchased with the vehicle*")* and any future

---

[5] Plaintiff is including a copy of the RPA because the copy submitted by Ally cuts off the definitions at the top of the back page.

[6] Additionally, the RPA, while still a consumer credit contract per the FCC, is wholy inadequate to comply with the Truth in Lending Act that mandates specific disclosures to be given to the consumer. See e.g., 15 U.S.C.A. §1604. Thus, adding support to the idea that the RPA would not be assigned Ally.

12

disagreements between the Buyer and the Seller related to servicing of the vehicle. If the Court extends the RPA to Ally, it would also support extending the RPA's arbitration agreement to anyone who may later service Plaintiff's vehicle or any disagreement about products purchased with the vehicle. Finding that the RPA was assigned to Ally without an actual assignment or extending a contract to others when it specifically identifies the parties to it is not consistent with how ordinary contracts are interpreted. Either would be the type of "novel rules to favor arbitration over litigation[]" that the Supreme Court rejected in *Morgan, supra*, discussed more fully below.

**F. There are No Special Privileges Given to Arbitration Clauses, they are Treated Like any other Contractual Rights.**

The recent Supreme Court decision in *Morgan v. Sundance, Inc.*, 142 S. Ct. 1708 (2022) directly supports denying Ally Bank's motion to compel arbitration. In *Morgan*, the Court addressed whether courts can or should create arbitration-specific procedural rules concerning arbitration.

In *Morgan*, the plaintiff filed a lawsuit despite having an arbitration agreement with the defendant. The defendant participated in litigation for several months before moving to compel arbitration. *Morgan,* 142 S. Ct. at 1711. The lower courts applied a prejudice requirement, holding that the defendant had not waived its right to arbitrate because, even though it had engaged in months of contested litigation, the plaintiff was not prejudiced by the delay. *Id.* at 1712-13**.** But a showing of prejudice was not consistent with the general requirements to show waiver of a contract provision. *Id.* The lower courts had been making up an arbitration-specific addition of prejudice as a requirement to show contractual waiver. The Supreme Court ruled that that was an impermissible judicially-created special requirement created to favor arbitration over litigation. *Id.* ¶ 1713-14. *Morgan* admonishes courts not to create "arbitration-specific variants of federal procedural rules." *Id.*

Applying the principles from *Morgan* to the present case reinforces several key points:

13

1. **The Court Must Determine if a Valid Agreement to Arbitrate Exists Between Plaintiff and Ally Bank**

As established in Section II.B of this brief, the question of whether a valid arbitration agreement exists between the parties is a threshold issue for the Court to decide. The FAA reflects the fundamental principle that arbitration is a matter of contract. See *Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63, 67 (2010). The Supreme Court in *Morgan* reaffirms that courts should not assume an agreement to arbitrate without clear evidence.

2. **Ally Bank Has Not Met Its Burden Under the Summary Judgment Standard**

Under the summary judgment standard applicable to motions to compel arbitration, the moving party bears the burden of demonstrating the absence of a genuine issue of material fact regarding the existence of an agreement to arbitrate. See *Air-Con, Inc. v. Daikin Applied Latin Am., LLC*, 21 F.4th 168, 175 (1st Cir. 2021). Ally Bank has failed to provide admissible evidence of an agreement to arbitrate between itself and the Plaintiff. Likewise, there is no evidence the Dealer assigned the class action waiver. Merely attaching the Retail Sales Agreement (RPA) between Plaintiff and the Dealer, without proper authentication or evidence of assignment, is insufficient. It smacks of Ally asserting a unique-to-arbitration rule that because there is an arbitration agreement connected to some part of a transaction, then arbitration must attach to any part of the transaction--but contracts (apart from, perhaps the special case of *in rem* rights in real estate) are between parties who have had a meeting of the minds.

3. **The Merger Clause in the RISC Precludes Incorporation of the Arbitration Agreement**

The RISC contains an unambiguous merger clause stating that "this contract contains the entire agreement between you and us relating to this contract." As discussed in Section II.E, such a

14

clause precludes consideration of external documents like the RPA. The Supreme Court in *Morgan* emphasizes that courts must honor the terms of the contract *as written*, without extending arbitration provisions beyond their agreed scope.

### III. ALLY'S MOTION TO STRIKE SHOULD BE DENIED

"A motion to strike collective action allegations is ... analyzed under the 12(b)(6) standard." *Cavallaro v. UMass Mem'l Health Care, Inc.*, 971 F. Supp. 2d 139, 145 (D. Mass. 2013) (citation omitted). At the motion to dismiss stage, the "question before the Court ... is not whether the class should be certified, but whether the class allegations in the complaint should be stricken. At this stage, the burden is not on the party seeking class certification[;] rather, as the non-moving party, all reasonable inferences must be construed in [his] favor." *Barrett v. Avco Fin. Servs. Mgmt. Co.*, 292 B.R. 1 (D. Mass. 2003).

Defendant's motion to strike is premised on unsupported inferences in *its* favor: that it must have been assigned the RPA and the class action waiver contained therein. As discussed above, that inference is not supported by the record. Regardless, all inferences, at this stage, should go in the Plaintiff's favor and the Motion to Strike should be denied.

### CONCLUSION

Based on the foregoing the Plaintiff respectfully asks the court to deny the Plaintiff's motion and to permit this matter to proceed.

                                                Respectfully Submitted,

Dated: October 21, 2024                    /s/     John Z. Steed
                                                    John Z. Steed, Esq. #5399
                                                    Island Justice
                                                    P.O. Box 771
                                                    Stonington, ME 04681
                                                    (207) 200-7077
                                                    john@islandjusticelaw.com

## **CERTIFICATE OF SERVICE**

    This is to certify that a true and correct copy of this document was served on the Defendant's counsel of record when filed through the Court's CM/ECF system on October 21, 2024.

                                    /s/    John Z. Steed

                                    John Z. Steed, Esq. #5399